RICHMOND & DANVILLE RAILROAD CO. *v.* WHITE & CO.

1. The rule of "extraordinary" diligence imposed upon common carriers by section 2066 of the code, requires the exercise of that degree of diligence to avoid needlessly exposing goods· to injury or destruction by an unforeseen act of God, such as an extraor-

RICHMOND RAILROAD CO. *v.* WHITE. [88 Ga.

dinary flood or freshet, and also to protect and preserve the goods after the peril has become apparent. And generally, in order for the carrier to avail himself of the act of God as an excuse, the burden of proof is upon him to establish, not only that the act of God ultimately occasioned the loss, but that his own negligence did not contribute thereto, for " in cases of loss the presumption of law is against him." This construction harmonizes in principle with cases heretofore dealt with by this court : *Berry* v. *Cooper,* 28 *Ga.* 543 ; *Wallace* v. *Clayton,* 42 *Ga.* 443 ; *Central Line of Boats* v. *Lowe,* 50 *Ga.* 509 ; *Richmond & Danville R. R. Co.* v. *Benson & Co.,* 86 *Ga.* 203.

2. A common carrier who, in violation of his general and uniform usage in dealing with consignees, fails to give notice of the arrival of goods, or who wrongfully detains them after they have been applied for by a consignee ready to receive them, is guilty of such negligence in exposing the goods to loss or damage by a subsequent freshet occurring whilst they are in store in his depot, and before giving any notice of their arrival, as to deprive him of excuse by the act of God, so far as these goods are concerned.

3. After it is shown by dates of shipment that the goods had time to arrive and be delivered to the consignee before the flood occurred, the burden of showing what part of the goods, if any, did not arrive within that time is upon the carrier ; and then the burden is on the consignee to show the damage done to those which did arrive, and the amount thereof, in order to recover on the ground of negligence in not giving notice of arrival, or in not delivering on application.

4. As to goods which arrived too late to admit of giving the usual notice to consignees before the flood occurred, the carrier was bound to the exercise of extraordinary diligence in protecting them from damage by the flood whilst they were in his cars or his warehouse. But if they were damaged in spite of such diligence, he would be excused.

5. The measure of extraordinary diligence is " that extreme care and caution which very prudent and thoughtful persons use in securing and preserving their own property" ; and the acts and facts constituting that diligence under all the circumstances of the case are for determination by the jury. It was therefore error to instruct the jury that if they find that the loss was in any respect due to the crowded condition of the depot, or to the want of sufficient hands, the carrier is liable. The emergency being extraordinary, the condition of the depot and the number of hands ready and available for the occasion might or might not be consistent with the exercise of due diligence.

6. The uncontradicted evidence being that some efforts were made by the carrier to save the plaintiff's goods, it was error to charge the jury upon any hypothesis grounded on the assumption or contingency that no efforts whatever were made.

7. Precautions for the protection of property which would have been available as against any previous flood of which the carrier (a railroad company) had knowledge, would not necessarily fill the measure of extraordinary diligence, inasmuch as history or tradition might make it incumbent on the carrier to have more knowledge than that actually possessed. In such matters it might be just to treat the means of knowledge as equivalent to actual notice.

October 1, 1892.   Argued at the last term.

Carriers. Negligence. *Onus.* Notice. Charge of court. Before Judge EVE. City court of Richmond county. August term, 1890.

White & Company sued the railroad company for failure to deliver goods in good order. The jury found for plaintiff $2,659.50; defendant's motion for a new trial was overruled, and it excepted. The motion contained the following grounds:

1. The court charged the jury : " Now, gentlemen, if you are satisfied from the evidence that the damage that occurred to these goods was occasioned by the flood, I charge you that would be the act of God, and if the defendant exercised that extreme care and diligence which a very prudent man would exercise in the preservation of his own property under like circumstances, then his plea would avail him and the verdict would be for the defendant. If you are satisfied that the damage resulted from the freshet, after the exercise on the part of the defendant of that extreme care and caution which a very prudent man would exercise in the preservation of his own property under similar circumstances, then your verdict should be for the defendant." This charge was assigned as error, in coupling the instruction that the act of God would excuse the carrier, with a proviso and a condition. The defendant contended that the act of God, when shown to have caused the damage, was an absolute discharge from liability, that the *onus* was shifted and it was necessary for the plaintiff to show that it was in fault, and that this charge was equivalent

to telling the jury that, along with proof of the act of God, defendant was bound to produce evidence going to show that it had not been guilty of any negligence.

2. The court charged: "Now, if you are satisfied from the evidence that has been submitted to you, that these goods or some of them arrived here a sufficient time before the flood to have been removed by plaintiff from that place to a place of safety, and it was the custom of the trade for notice to be given, or if the plaintiff applied that day for them and he was refused, then the defendant would be liable to the plaintiff for all such goods." Error, in that the jury were instructed that the failure to give a notice would make the defendant liable, and that if the plaintiff applied that day for the goods and they were refused, the defendant would be liable, notwithstanding they were destroyed by an act of God; ignoring the principle which gives the defendant a reasonable opportunity and time to deliver goods after their arrival in cars in the yard.

3. The court charged: " If the jury find from the evidence that goods sued for in this action arrived in this city prior to the freshet, in time to give the company opportunity to unload and make ready for delivery, and that prior to the freshet the plaintiff sent to the depot for them and the same were not delivered on demand, and in consequence of their remaining in the depot thereafter they were damaged by the flood, the plaintiff is entitled to recover the value of such goods." Error in that while there was evidence that some goods came on the morning of the overflow, this instruction related to some which were supposed to have come in previously, and did not inform the jury that it was the duty of the plaintiff to show by evidence what part of the goods were claimed to have come in previously, so as to be embraced within this charge, and the value thereof. Further, the jury were here instructed that a mere delay

in delivering goods, which was the remote cause, could render the defendant liable, notwithstanding the jury should believe that the damage was done by an act of God, which was the proximate cause.

4. The court charged: "If the jury believe from the evidence that it was the custom of the plaintiff and of the trade in Augusta for notice to be given to consignee of the arrival of the goods, immediately upon the arrival thereof, and that the goods sued for in this case arrived in time for notice to have been given thereof, and in time for them to have been removed, and that no notice of their arrival was given to the plaintiff, and in consequence they remained in the depot and were damaged, then the plaintiff would be entitled to recover." Error, because the only effect of a notice to the consignee was, to terminate the liability of a common carrier and make that of a warehouseman to begin, and to change the degree of diligence from extraordinary to ordinary; but the court here charged absolutely that if the goods remained in the depot because no notice was given and were damaged, plaintiff would be entitled to recover, making the liability to depend upon the failure to give a notice, and this notwithstanding the fact that the damage was done by an act of God.

5, 6. Errors in the charge, as to which see the opinion.

7. Error in not giving the following charge, as requested by the defendant, without alteration: "An extraordinary flood or overflow of water which is unprecedented, is termed in law an act of God, and if goods in the hands of a railroad company are damaged by such an overflow it excuses the railroad company, unless the plaintiff shows to you by satisfactory evidence that the company was wanting in due care. Human experience is a safe guide in such matters as this, as well as in others, and where precautions have been taken which would have protected the property against any previous

flood within the knowledge of the company, there is no rule of law which requires them to do more in advance or in anticipation." The court struck out the words " within the knowledge of the company," and inserted in lieu thereof " ever before known"; and it was insisted by defendant that this charge imposed upon it the duty of guarding against contingencies which, so far as it knew, would never happen, because, so far as it knew, they never had happened, and required it to take notice of something of which it did not have notice.

BRYAN CUMMING and POPE BARROW, for plaintiff in error.

JOSEPH R. LAMAR, *contra.*

BLECKLEY, Chief Justice.

1. It may be conceded that the weight of authority elsewhere is to the effect that the degree of diligence due from a common carrier in guarding goods against injury by the act of God is not extraordinary but only ordinary. Hutch. on Car. (2d. ed.) §§201, 202 ; Schouler on Bail. & Car. (2d ed.) §§436, 437. But for us the question is settled by statute. The code, section 2066, reads as follows: "One who pursues the business constantly or continuously for any period of time, or any distance of transportation, is a common carrier, and as such, is bound to use extraordinary diligence. In cases of loss the presumption of law is against him, and no excuse avails him unless it was occasioned by the act of God or the public enemies of the State." A correct interpretation of this language requires us to hold that no degree of diligence whatever will excuse a common carrier of goods if the loss happens by anything except the act of God or the public enemies of the State. This being so, it is only when the loss is alleged to have been occasioned by one of these causes that the diligence of the carrier has to be tested. It follows, that if the rule of extraordinary diligence here prescribed by statute is

not applicable in such cases, it could never be applied at all.

It may also be conceded that by the weight of authority elsewhere, as soon as the carrier proves that the loss happened from the immediate agency of the act of God, a presumption arises that he, the carrier, was duly diligent; and consequently, that the burden of proof is at once shifted to the opposite party.    Hutch. on Car., *supra*, §§202a, 766, 767 ; Schouler on Bail. & Car., *supra*, §439.    The code, however, in the section just quoted, says that in case of loss the presumption of law is against the carrier, and this affirmation occurs immediately after the duty of extraordinary diligence is enunciated.    What, then, is the content of the presumption referred to ?    Obviously that the carrier has not been duly diligent, and that the loss in whole or in part is attributable to his negligence.    This presumption is not met or removed by showing merely that the act of God was the ultimate occasion of the loss ; that is, that it was the final and chief factor from which the loss resulted.    To silence the presumption altogether, it is necessary to go further and show that the act of God was the sole cause, and that the loss happened in spite of the use of due diligence by the carrier to prevent it. This, at least, must be the general rule, and the one applicable to every case in which the circumstances attending the calamity are such as to suggest the probability that the loss might have been avoided had extraordinary diligence been exercised.    The present case is one of this character.    While the evidence does not show positively that the use of such diligence would have been effectual, it does show indubitably that the occasion was one which called for some diligence and afforded time and opportunity for exercising it, and that previous to actual trial there was a fair degree of probability of saving the goods from damage by the freshet.

Other persons in the same city who had goods similarly exposed protected them, in whole or in part, by elevating them sufficiently high to prevent the water from reaching them. It was manifestly incumbent upon the carrier to protect these goods in the same way, or by some other means, if it could be done by the exercise of extraordinary diligence. The burden of showing that this duty was recognized and its performance attempted, and what acts were done in prosecuting the attempt, rested, we think, under the provisions of our code, upon the carrier. We think, moreover, that this is where the burden ought to rest, for in its nature the defence of loss by the act of God involves a due accounting by the carrier for his own diligence, so as to make it appear that the loss was occasioned by the act of God solely, unmixed with contributory negligence on the part of the carrier. Doubtless where the carrier is in no previous default, and the providential act is so sudden and of such a nature as to leave no interval of time within which preventive measures against its effects could be taken, the mere proof of the act alone, and of the consequent loss, would establish the defence. This would be reasonable. But where the circumstances make a plain case for the exercise of some diligence, and time for its exercise intervenes after the peril has become apparent, the burden of showing that the requisite diligence was actually exercised ought to rest upon the carrier. The inquiry relates to his conduct, and he, his servants or agents, must know what that conduct was, and they of all persons have the best means, and not infrequently the only means, of proving it. It seems reasonable to hold the carrier to the rule of extraordinary diligence, both to avoid needlessly exposing the goods to injury or destruction by an unforeseen act of God, and to the use of measures for the protection and preservation of the goods after the peril

has become apparent. And whenever any question as to his diligence is fairly involved in the facts and circumstances of the case, it is equally reasonable that he should be required to make his diligence manifest rather than that his adversary should bear the burden of successfully attacking it in the first instance by such evidence as may chance to be in his power. Indeed, the code applies the presumption of default after proof of loss, not only to common carriers, but to all bailees, section 2064 declaring that "In all cases of bailments after proof of loss, the burden of proof is on the bailee to show proper diligence." The word "loss" in this section has been construed to mean injury or damage to the goods as well as their destruction or disappearance. *Hawkins* v. *Haynes*, 71 *Ga.* 40. There can be no question that the word has a like meaning in section 2066, as applied to common carriers. Perhaps no case heretofore decided by this court is directly in point as an authority decisive of the present, either upon the measure of diligence or the burden of proof; but the construction of the code upon both of these elements which we have arrived at harmonizes with the trend of judicial thought as indicated in several cases which the court has dealt with: *Berry* v. *Cooper*, 28 *Ga.* 543; *Wallace* v. *Clayton*, 42 *Ga.* 443; *Central Line of Boats* v. *Lowe*, 50 *Ga.* 509; *Richmond & D. R. R. Co.* v. *Benson & Co.*, 86 *Ga.* 203. It may be said, too, that from the cases holding that the burden of proof as to diligence is upon the carrier where the loss happens from an excepted risk (that is, a risk expressly excepted by contract), the inference is a necessary one that a like burden rests upon him when he seeks to avail himself of the defence that the loss was occasioned by the act of God. One of the cases of exception by contract, namely, *Columbus & Western Ry. Co.* v. *Kennedy*, 78 *Ga.* 646, follows (without citing it) *Berry* v. *Cooper*, *supra*.

In the body of the opinion, however, and in the 3d head-note, the rule of diligence is put too low, being that prescribed in section 3033 of the code, which is applicable to injuries committed by railroad companies generally, instead of to injuries to goods which these companies have in their possession as common carriers. The proper reference to the code would have been to section 2066, which exacts extraordinary, and not merely ordinary, diligence.

2. It came out in evidence that a part of the goods embraced in this action, and which were injured by the flood, arrived at the company's warehouse in time to have been received by the consignee and removed before the freshet occurred, and that there was not only an omission to give the usual notice of arrival customary in the business, but probably that these goods, or some of them, were detained by the carrier after they had been applied for by a drayman in behalf of the consignee. So far as these packages of goods were concerned, the carrier failed in diligence, and thus needlessly exposed the goods to loss before it was known or could be known that they would be put in peril by the particular act of God which subsequently affected them to the owner's damage. It is contended that this failure in diligence did not cast the risk upon the carrier, but that the goods remained at the risk of the owner; and when injured by the freshet, if this occurred without any other failure in diligence on the part of the carrier, the carrier would be excused. We think otherwise. Had there been no usage as to giving notice of arrival, the failure to give it could not have been imputed to the carrier as negligence at all : his relation to the goods in store would have been changed from that of a common carrier to that of a mere warehouseman. *Southwestern Ry. Co.* v. *Felder*, 46 *Ga.* 433 ; Code, §2070. But this carrier, as well as most others of like kind in the city,

had a general ' and uniform custom or usage of giving notice to consignees within a short time after the arrival of consignments. Not to comply with this custom or usage was to fall short of that measure of diligence which consignees would have a right to expect. Furthermore, in this case there was evidence tending to show that the goods were probably applied for, and no reason appears why those in store were not delivered. *Prima facie*, their detention was wrongful; and if so, they were thenceforth at the risk of the carrier, so long, at least, as their arrival was unknown to the consignee. This, we think, is the sounder and better view of the law of this disputed question. Indeed the principle, so far as liability turns on wrongful detention after demand, is ruled by the case in 86 *Ga.* above cited, *Richmond & D. R. R. Co.* v *Benson & Co.* And when failure to give notice in compliance with usage is the real cause why the goods were needlessly exposed to the hazards of a freshet which subsequently injured them, there would seem to be as much reason for charging the carrier with the consequences as if the exposure had resulted from wrongful detention after demand. In cases where it is not highly probable that notice, if given, would have resulted in withdrawing the goods from the carrier before the freshet occurred, the mere failure to give notice might not deprive the carrier of his defence. But in the present case, if there was an application for the goods by the drayman, this rendered it reasonably certain that the goods would have been withdrawn if notice had not been omitted; for if the drayman could have supported his application by the production of a notice, he would doubtless have been attended to. It should be added that the evidence of an application by the drayman is not express, but only within the range of inference. It may be that, according to the course of business, the mere presence of the drayman together

with his dray at the depot might be considered by those who understood the meaning of his presence as equivalent to an express application. How this may be is more or less uncertain as the evidence now stands.

3. Touching the burden of proof as to what particular packages of goods arrived before the freshet occurred and which could have been delivered to the consignee if the due course of business had been observed, we think after it was shown by dates of shipment that all the packages, or such and such of them, *might* have arrived, the burden of showing what packages, if any, did not arrive within time to have been delivered before the disaster, was upon the carrier; and then the burden would be cast upon the consignee to show the damage done to the residue and the amount thereof, in order to recover on the ground alone of negligence in not giving notice of arrival, or in not delivering on application. The means of supplying the dates of arrival are with the carrier.

4. The evidence indicates that some of the goods were not unduly delayed on the way, and yet did not arrive until it was too late to give the usual notice before the freshet occurred. As to these the carrier was bound to the exercise of extraordinary diligence in protecting them from damage by the flood whilst they were in his cars or his warehouse. But if they were damaged in spite of such diligence, he would be excused. As there is to be another trial, we forbear to express any opinion as to whether the evidence made out a case of due diligence or not. It certainly showed considerable diligence, and tended to explain why more was not practicable or deemed necessary beforehand.

5. The measure of extraordinary diligence is "that extreme care and caution which very prudent and thoughtful persons use in securing and preserving their own property." Code, §2062. The acts and facts con-

stituting this diligence, under all the circumstances of the case, are always for determination by a jury. This being so, it was error to charge, as set out in the 6th ground of the motion for a new trial, that " if the jury find that the loss was in any respect due to the crowded condition of the depot, or to the want of sufficient hands, the railroad is liable." The emergency was an extraordinary one, and what preparations to meet it were reasonably necessary, whether with respect to the condition of the depot or the number of hands ready and available, were matters of fact for consideration by the jury. It is obvious that the actual preparations might or might not be consistent with the exercise of due diligence. The crowded condition of the depot and the want of sufficient hands might have contributed to the loss without either being the result of any negligence on the part of the company. The court trenched on the province of the jury in this part of the instruction.

6. It was also error to instruct, as set out in the 5th ground of the motion, that " if the jury find there were no efforts made whatever to save the plaintiff's goods, and if proper efforts had been made the goods would have been saved, the plaintiff would be entitled to recover the value of such goods as could have been saved." The facts of the case furnish no basis for this instruction. Most of the plaintiff's goods were unloaded and in the depot. The uncontradicted evidence is that some efforts were made to save the goods in the depot. On this branch of the case the controversy was not as to the omission of all measures for saving the goods, but as to the incompleteness and insufficiency of those which were employed. The question for the jury was, whether the company did as much as it could or ought to have done under the rule of diligence to which it was subject and under all the circumstances which surrounded it.

v 88-52

No hypothesis which lies beyond the range of all the evidence should be given in charge to the jury.   Mischief often results from a disregard of this rule, inasmuch as the jury will naturally conclude that the judge sees in the evidence some ground for any and every hypothesis which he submits to them for consideration. The court could not rightly suggest to the jury either that the efforts made by the company amounted to nothing, or that there ought to have been more done than was done.   As to some of plaintiff's goods, the evidence does indicate that nothing was done to save them; but the charge extends hypothetically to the whole of them, and it was not for the court to say that it was negligence *per se* for the company not to attempt to save more of the goods than it did attempt to save. The company's duty in this respect would depend upon circumstances to be considered by the jury.   It might be that in view of the quantity of goods involved in the disaster, it was discreet and proper for the company, with the means at its command, to confine its active diligence to some of the goods, and leave the rest to their fate.   The jury, and not the court, should deal with all the particulars and details of the company's conduct on the occasion, both as to what ought to have been done, and what was done.   Did the company exercise that extreme care and caution which very prudent and thoughtful persons would use in securing and preserving their own property, under like conditions and circumstances?

7.  We agree with the trial court that the precautions for the protection of the property which would have been available against any previous flood of which the company had knowledge, would not necessarily fill the measure of extraordinary diligence.   This flood was in the year 1888, and there had been a higher one in the year 1840.   History or tradition might have made it in-

cumbent on the company to have some knowledge or information as to that instance of high water. Many persons still living would be likely to know of it; and it might or might not be just to treat, as against the railroad company, its means of knowledge as equivalent to actual notice. The jury would be apt to deal rightly with such a question.

The court erred in not granting a new trial on the 5th and 6th grounds of the motion, the points discussed in the 5th and 6th divisions of this opinion.

*Judgment reversed.*